# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUSTIN F., DOUGLAS FREY, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | NO. 3:04CV1149 (MRK) |
| v. | : | |
| | : | |
| PHILLIP MALONEY, ET AL., | : | |
| | : | |
| Defendants. | : | |

## RULING AND ORDER

In this action, Plaintiffs Douglas Frey and Justin F. sue the Town of Milford and Milford Police Sgt. Phillip Maloney under 42 U.S.C. § 1983, the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, and Connecticut state law. *See* Complaint [doc. # 1]. Plaintiffs claim that Sgt. Maloney violated their constitutional, statutory, and common law rights when he allegedly elicited false statements from other minors in order to obtain a warrant for the arrest of Justin, also then a minor, on charges of criminal attempt at sexual assault of a minor. In particular, Plaintiffs assert claims of false arrest, malicious prosecution, and racketeering, as well as claims that Sgt. Maloney violated Justin's constitutional rights, including his rights under the Fifth Amendment. Currently pending before the Court is Defendants' Motion for Summary Judgment [doc. # 95].

The Court has no doubt that Justin's arrest and prosecution were a source of great emotional distress for Douglas Frey and his son Justin, that they remain extremely upset by the handling of the incident that led to Justin's arrest, and that they genuinely and in good faith believe, perhaps even rightly, that the other minors' allegations against Justin were false and unfounded. Nothing in this decision is intended to demean their pain in any way. However, this civil action is not the forum in

which to determine the truth regarding what Justin did or did not do with the other minors. The proper venue for vindication of that sort was the juvenile court, where Plaintiffs, for undoubtedly good and sufficient reasons, decided to enter into a plea arrangement. Thus, the central issue in this case is not whether the other minors told the truth about Justin, but rather whether Sgt. Maloney unlawfully misstated their assertions in his application to the state court for an arrest warrant or knew that the minors' assertions were false at the time he applied for the arrest warrant. For the reasons that follow, the Court concludes that Sgt. Maloney did not do so. As a consequence, the Court GRANTS Defendants' Motion for Summary Judgment on Plaintiffs' § 1983 claims and RICO claims. Having disposed of the only federal claims in this case, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, which the Court DISMISSES without prejudice to renewal in state court.

## I.

This case arises from the investigation, arrest, and prosecution of Justin for the alleged criminal attempt at sexual assault of a minor victim, whom the Court will refer to as "K." The warrant Sgt. Maloney obtained for Justin's arrest on that charge was also supported by allegations from two other minors, whom the Court will refer to as "O" and "N." As is required on a motion for summary judgment, the Court relates the facts in the light most favorable to Plaintiffs. This brief factual recitation draws principally from uncontested statements in the Defendants' 56(a) Statement [doc. # 96-2]. Further facts will be recited, as needed, in later sections.

On May 7, 2003, Milford police received a report of suspicious activity and sexual contact involving children. Milford Police Officer Kakalow responded to this report. Officer Kakalow met the complainant, K's mother, who gave an initial written and sworn statement declaring that Justin

(age 14) had touched her daughter K (age 11) in a sexual way and attempted to unhook her bra while she, N (male, age 10), and O (male, age 8) had been playing at Justin's house two days before. *See* 56(a) Statement [doc. # 96-2] para. 5. While at the complainant's house, O told Officer Kakalow that Justin exposed himself and asked O to engage in a specific sexual act that need not be repeated here. *Id.* para 6. Also at that time, N told Officer Kakalow that Justin "beat him up and left bruises on his back." *Id.* para. 7. Officer Kakalow suspended any further questioning of O and N until their parents had been notified of the allegations. Stephen Stefan, Justin's neighbor, confirmed in a sworn statement to Officer Kakalow that on the afternoon following the alleged incident, the three minor victims had made the same allegations against Justin, and that he had told them to tell K's mother about Justin's conduct.

Initially, K's mother did not wish to press charges against Justin, but merely wanted him to get help and wanted to make certain that Justin's father, Douglas Frey, was made aware of the situation. After being notified of the incident, O's parents also indicated they did not want to pursue charges against Justin, but they did ask that the incident be made a matter of record. Officer Kakalow attempted unsuccessfully to speak with Plaintiffs at their home, and left a note asking Mr. Frey to contact him at the Milford Police Department.

On the following day, Sgt. Maloney, a member of Milford Police Department's Youth Bureau, took over the investigation of the allegations regarding Justin. He contacted the New Haven Juvenile Court Prosecutor Cathleen Edwards to apprise her of the incident and to advise her that no one interviewed wished to press charges against Justin. Sgt. Maloney also informed her that he would be contacting the Connecticut Department of Children and Families ("DCF"), in accordance with applicable Connecticut law. Ms. Edwards told Sgt. Maloney that, if the events alleged did

occur, she wanted Justin to receive counseling; it was Ms. Edwards' position that, if Justin did receive counseling, she would not pursue a prosecution of the alleged incident. *See* 56(a) Statement [doc. # 96-2] para. 12.

Sgt. Maloney contacted K's mother on May 9, 2003, and she confirmed once again that she did not wish to file any charges. On May 15, 2003, Sgt. Maloney received a phone call from Lori Read, a case worker that DCF had assigned to the investigation. She informed Sgt. Maloney that she would attempt to contact Mr. Frey. Ms. Read then sent two letters to Mr. Frey in an attempt to initiate that inquiry. On May 21, 2003, Ms. Read informed Sgt. Maloney that Mr. Frey would not allow her to interview Justin, and she described Mr. Frey as being uncooperative.

Sgt. Maloney claims that he then contacted Mr. Frey and informed him that if he and Justin cooperated with DCF and followed DCF's suggestions for counseling, the authorities would not pursue an arrest of Justin. Mr. Frey disputes Sgt. Maloney's claim. Mr. Frey asserts that during their conversation, he advised Sgt. Maloney that there was no credible evidence against Justin. Mr. Frey also alleges that Sgt. Maloney insisted that Justin be tested and threatened to "make things worse" for Justin if he did not submit to an interview with DCF and psychological testing. *See* Plaintiff's Local Rule 56(a) Statement [doc. # 109] para. 17; Memorandum in Support [doc. # 96] Ex. C at 92-93. Mr. Frey did not ask Sgt. Maloney what he meant by the phrase "make things worse." Sgt. Maloney allegedly then threatened that if Mr. Frey did not accede to his demands, Sgt. Maloney would tell the state court that Mr. Frey had been uncooperative. *See* Pls.' Local Rule 56(a) Statement [doc. # 109] Ex. 1 para. 10 (Affidavit of Douglas Frey).

On June 10, 2003, Ms. Read contacted Sgt. Maloney to inform him that Mr. Frey was not cooperating to DCF's satisfaction. Sgt. Maloney then left Mr. Frey a telephone message**,** which Mr.

Frey recorded, stating the following: (1) that the investigation would continue; (2) that Sgt. Maloney wanted to know whether Mr. Frey would allow him to interview Justin; (3) that Sgt. Maloney would interview other individuals; and (4) that Sgt. Maloney would inform Mr. Frey if a warrant issued for Justin's arrest. *See* 56(a) Statement [doc. # 96-2] para. 19. On June 14, Milford Police Detective Ricci met with and obtained a written statement from N, whose parents had brought him to the station, and on June 15, Detective Riordan met with O and his father. Sgt. Maloney asserts that O told Det. Riordan about the substance of O's earlier accusations, and that O's father then prevented Det. Riordan from interviewing O further. *Id.* para. 21. Mr. Frey disputes the content of Det. Riordan's conversation with O on the basis of statements that O's father allegedly later made to Mr. Frey.

On June 16, 2003, Sgt. Maloney obtained a written statement from K. While K's original allegations against Justin were that he pulled up her shirt and tried to unhook her bra, the written statement Sgt. Maloney obtained on June 16 contained more serious allegations against Justin. Besides alleging earlier incidents when Justin behaved in a sexual manner toward her, including the incident in which Justin supposedly exposed himself to O, K also asserted that on the day of the incident in question, Justin had beaten up N, and after burying N in pillows, directed K to lay down on a mattress in Justin's living room with her eyes closed. K asserted that Justin then "started touching [her], and during the touching [of her] on all the private parts, he then took out his thing, started humping [her], and touching [her] at the same time." Mem. in Supp. [doc. # 96] Ex. G. K said that she then opened her eyes and started screaming, that N began to get up from the pillows, but that Justin told N to remain where he was. K claimed that she began screaming for N to get up, that he did so, and that Justin quickly righted his clothing and began again to beat N. K claimed that

she attempted to escape the situation, but that Justin "grabbed [her] neck and started fake-choking [her], like pretending to choke [her], but he really had his hands around [her] neck tight. It hurt a little bit." *Id.*

K's mother also provided an additional, sworn statement to Sgt. Maloney on June 16. She said that she had been unaware of the events alleged by K in her written statement, and that after reading them, she wanted Justin arrested "because [she] wanted to make sure he gets help." Mem. in Supp. [doc. # 96] Ex. F. Finally, K, at the prompting of her mother, told Sgt. Maloney that Justin had talked about raping a seven-year old girl in the neighborhood whom K watched and that he had stated that he and other children in the neighborhood should gang-rape the seven-year old.

On June 17, 2003, Sgt. Maloney interviewed S, a friend of K's, and received a written statement from her. S recounted an incident that occurred the previous Halloween, when she and her cousin picked K up at Justin's home in order to go to a haunted house. S said that when they returned home later that evening, K told her that Justin had tried to make K "touch his privates." *See* Mem. in Supp. [doc. # 96] Ex. J. S also informed Sgt. Maloney that in the month before the investigation, K had told her that Justin had raped her and, when questioned further by S, K said she did not want to talk about the incident. *See id.*

On June 24, 2003, Sgt. Maloney spoke to O's father about the possibility of interviewing O's older brother, whom Sgt. Maloney believed might have information relating to the incidents under investigation. O's father refused, and told Sgt. Maloney that nothing had happened with his son and Justin. Sgt. Maloney asked O's father if O had lied to the police, and O's father replied that his son had not lied, because his son had never told the police that anything had happened. When Sgt. Maloney told O's father that O had told both Officer Kakalow and Det. Riordan that something had

happened, O's father stated that the officers had forced O to say those things and that nothing had actually happened. O's father then refused to allow Sgt. Maloney to interview O's brother.

On July 3, 2003, Sgt. Maloney submitted an application for Justin's arrest. The application included a detailed affidavit recounting the statements of the minors and their parents. The application for the arrest warrant was reviewed and approved by a prosecutor in the State's Attorney's Office. The application was then submitted to a judge of the Connecticut Superior Court, who signed the arrest warrant. *See* 56a Statement [doc. # 96-2] para. 28. Sgt. Maloney then advised Mr. Frey that an arrest warrant had been issued for Justin. On July 8, 2003, the Plaintiffs arrived at the Milford Police Department so that the arrest warrant could be served. Justin was initially charged with two counts of criminal attempt at sexual assault in the first degree.

Following his arrest, Justin appeared at a juvenile detention hearing and his charges were downgraded to two counts of attempted sexual assault in the second degree.[1] Justin was represented by Plaintiff Douglas Frey, an attorney, during the juvenile detention proceeding and at all future proceedings. At the hearing, the presiding judge ordered Justin not to have any contact with K, O, or N. The judge also ordered Justin to remain under house arrest and submit to electronic monitoring, to have no unsupervised contact with anyone under the age of eighteen, and to cooperate with probation. While the judge denied Justin's request to attend a summer camp out of state, he did allow Justin to spend time at his grandparents' house. *Id.* para. 35.

On July 22, 2003, the Superior Court continued its previous orders with one change; the court prohibited Justin from having unsupervised conduct with individuals under fifteen, rather than

---

[1]The prosecutor downgraded the charges because Justin had no criminal history and because the initial charges against him would trigger an automatic transfer out of juvenile court into the adult system, given Justin's date of birth. *See* Mem. in Supp. [doc. # 96] Ex. L at 2.

eighteen. On August 19, 2003, Justin moved for removal of electronic monitoring and to be free from a court-imposed curfew, but the court denied the motion.

On December 1, 2003, Justin reached an agreement with the State's Attorney's Office under which Justin would undergo psychological and psychiatric evaluations and, if indicated by the evaluations, counseling. The agreement stated that if Justin complied with the evaluations and any recommendations following the evaluations, the State would agree to entry of a *nolle prosequi* on the criminal charges against Justin. It is undisputed that a dispute arose between Mr. Frey and one of Justin's evaluators, and so the final evaluation of Justin did not take place as scheduled.

On January 12, 2004, Justin filed a Motion to Dismiss, or in the alternative, for entry of a *nolle prosequi* on the charges against him. The court denied the motions on January 27, and Justin appealed the denial. On March 3, 2004, the court ordered Plaintiffs to cooperate regarding Justin's remaining evaluations. On or about June 16, 2004, Justin satisfied the court's requirements, and the court then entered a *nolle prosequi* and dismissed the criminal charges against him. On July 13, 2004, the Connecticut Appellate Court dismissed Justin's interlocutory appeal of the trial court's January 27, 2004 decision denying Justin's motion to dismiss. *See* Pls.' Local Rule 56(a) Statement [doc. # 109] Ex. 13.

This action against Sgt. Maloney and the Town of Milford was filed on July 13, 2004.[2] The case also originally included claims against K and her parents, but those claims were settled, leaving only Sgt. Maloney and the Town of Milford as defendants.

---

[2] Douglas Frey does not appear to assert any federal claims on his own behalf, but rather sues derivatively for the alleged injuries to his son.

## II.

The summary judgment standard is a familiar one. Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica College of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must draw all ambiguities and inferences in favor of Plaintiff, *see Anderson*, 477 U.S. at 255. If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials . . . ." Fed. R. Civ. P. 56(e). Rather, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

The Court will first address Plaintiffs' §1983 claims against Sgt. Maloney for false arrest and

malicious prosecution. The Court will then turn to Plaintiffs' remaining claims under § 1983 against Sgt. Maloney, their claims against the Town of Milford, and their RICO claims against Sgt. Maloney.

### III.

"Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are substantially the same as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (internal quotation marks omitted). "False imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." *Binette v. Sabo*, 244 Conn. 23, 63 (1998) (internal quotation marks omitted); *see also Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). "An action for malicious prosecution against a private person requires a plaintiff to prove that: (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff, (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *McHale v. W.B.S. Corp.*, 187 Conn. 444, 447 (1982).

Plaintiffs' claims of false arrest and malicious prosecution against Sgt. Maloney fail for two independent reasons. First, the charges against Justin did not terminate in his favor, as is required by Connecticut law. Second, and in any event, Sgt. Maloney had probable cause, or at least arguable probable cause, to arrest Justin.

### A. Favorable Termination.

The Second Circuit has held that to state a claim of false arrest under Connecticut law–and, therefore, to state a § 1983 claim for false arrest–a plaintiff must prove that the prosecution on the arrest terminated in the plaintiff's favor. "A person who thinks there is not even probable cause to

believe he committed the crime with which he is charged must pursue the criminal case to an acquittal or an unqualified dismissal, or else waive his section 1983 claim." *Roesch v. Otarola*, 980 F.2d 850, 853 (2d Cir. 1992); *see Torres v. Howell*, No. 3:03CV2227 (MRK)(WIG), 2006 WL 1525942, at *5-*6 (D. Conn. May 30, 2006) (observing that courts have questioned *Roesch*'s statement of Connecticut false arrest law, but nevertheless following *Roesch*).[3]  Similarly, "[t]o prevail on a claim of malicious prosecution, a plaintiff must prove that . . . 'the criminal proceedings have terminated'" in his favor.  *Heussner v. Day, Berry & Howard, LLP*, 94 Conn. App. 569, 577 (App. Ct. 2006) (quoting *McHale*, 187 Conn. at 447).

Plaintiffs may satisfy the favorable termination element by showing that the charges against Justin were "'discharged without a trial under circumstances amounting to the abandonment of the prosecution without request by him *or arrangement with him*.'"  *White v. Wortz*, 66 F. Supp. 2d 331, 334 (D. Conn. 1999) (quoting *See v. Gosselin*, 133 Conn. 158, 160 (1946)); *see also Russo v. City of Hartford*, 184 F. Supp. 2d 169, 186 (D. Conn. 2002) ("[S]o long as the prior action terminated without any adjudication against, or settlement requiring consideration from, the . . . plaintiff, the Connecticut Supreme Court deems the termination prong satisfied.").  A *nolle prosequi*, such as that

---

[3]The Court notes that *Roesch*'s assessment of Connecticut false arrest law has been questioned.  *See, e.g.*, *Weyant v. Okst*, 101 F.3d 845, (2d Cir. 1996) (noting that "Connecticut law is less clearly settled" than New York law as to whether a favorable termination is required for a false arrest claim); *Holman v. Cascio*, 390 F. Supp. 2d 120, 125-26 (D. Conn. 2005) (noting courts that have questioned *Roesch*'s holding).  Moreover, in *Singer v. Fulton County Sheriff*, 63 F.3d 110 (2d Cir. 1995), the Second Circuit, in considering a § 1983 false arrest claim that arose under New York law, stated that "[a] favorable termination of the proceedings is not an element of this tort [of false arrest]."  *Id.* at 118.  The Second Circuit has recently alluded to the conflict in this district arising from the tension between *Roesch* and *Weyant* in the context of *nolle prosequis*.  *See Russo v. City of Bridgeport*, No. 95 4392, 2007 WL 603066, at *6 n.9 (2d Cir. Feb. 27, 2007).  Absent controlling authority to the contrary–either in the Second Circuit or in the Connecticut Supreme Court–the Court will, as it must, follow *Roesch* on the elements of false arrest under Connecticut law.

entered in this case, can constitute a favorable termination, so long as the plaintiff demonstrates that it was entered under circumstances indicating that the State has abandoned the prosecution without request by the plaintiff or arrangement with him. *See Holman v. Cascio*, 390 F. Supp. 2d 120, 123 (D. Conn. 2005) ("[A] nolle of the criminal charge may still permit the plaintiff to satisfy [the element of a favorable termination] if the circumstances of the nolle satisfy the *See v. Gosselin* test of 'an abandonment of the prosecution without request from or by an arrangement with [the defendant].'").[4]

Plaintiffs cannot satisfy this standard. Under the terms of an agreement that Plaintiffs worked out with the prosecutor, a *nolle prosequi* would enter only if: (1) Justin submitted to three psychological, psychiatric, and sexual offender evaluations; *and* (2) the Plaintiffs complied with any recommendations that might result from the evaluations. Mr. Frey admits that he entered into this arrangement with the prosecutor. *See* Mem. in Supp. [doc. # 96] Ex. D. at 171. As Mr. Frey himself put it, "[w]e agreed to have [Justin] evaluated three different ways, and also we agreed that if there were recommendations in those evaluations, that we would comply with the recommendations . . . . and once he had completed that, . . . the state would give a *nolle*." *Id.* at 172-73. It is undisputed that Plaintiffs requested entry of the *nolle*–indeed, Mr. Frey moved to dismiss the case or for the entry of the *nolle* when a dispute arose with one of the designated evaluators. While Mr. Frey argues that the State breached the *nolle* deal and that he rejected the deal by filing his motion to dismiss, he conceded at oral argument that, while the Plaintiffs could have insisted on Justin's right to trial and could have refused the subsequent entry of a *nolle*, they affirmatively agreed to the entry of a *nolle*

---

[4] This Court's decision in *Simpson v. DeNardo*, No. 3:02CV1471(MRK), 2004 WL 1737444, at *10 (D. Conn. July 29, 2004) should not be read to suggest otherwise.

on the basis of the agreement Plaintiffs had requested and arranged with prosecutors. Further, it is undisputed that Justin did ultimately undergo three evaluations, in accordance with the agreement with the prosecutor, and that there were no further recommendations because the evaluations did not indicate that any further counseling and treatment were necessary.

On the basis of these undisputed facts, it is apparent that the charges against Justin were not discharged under circumstances amounting to an abandonment of the prosecution without request by Justin or arrangement with him. *See DeLaurentis v. City of New Haven*, 220 Conn. 225, 250-51 (1991) (explaining that "favorable termination" in the criminal context means that the charge "was abandoned or withdrawn without consideration, that is, withdrawn without either a plea bargain or a settlement favoring the party originating the action"); *St. Paul v. Griffin*, No. 4001817, 2006 WL 2773418, at *4 (Conn. Super. Ct. Sept. 12, 2006) ("Applying the law as set forth in *See v. Gosselin* and *DeLaurentis v. New Haven*, . . . this court holds that the underlying criminal proceedings did not terminate in favor of the plaintiff because they were nolled by arrangement with the plaintiff." (internal quotation marks omitted)). Accordingly, Plaintiffs have not, and cannot, establish that the charges against Justin were terminated in his favor.

In response, Plaintiffs make two arguments, neither of which withstands scrutiny. First, Plaintiffs say that because the evaluations of Justin led to no further recommendations, the evaluations necessarily show that Justin was innocent of the charges against him and that accordingly, the resolution of the charges was "favorable." However, the Connecticut Supreme Court has made it clear that a plaintiff must show that the State *abandoned* the prosecution "without request from or by arrangement with him." *Gosselin*, 133 Conn. at 160. Even though no recommendations followed the evaluations required by the State, Plaintiffs nonetheless agreed that

Justin would undergo the evaluations and that he would comply with any recommendations that resulted. In return for those compromises on Plaintiffs' part, the prosecutor agreed to the *nolle*. The mere fact that the evaluations did not result in any further recommendations is insufficient to demonstrate that the charges against Justin terminated in his favor. As one Superior Court has put it, while "the accused by his acceptance of a compromise does not admit his guilt, the fact of compromise indicates that the question of his guilt or innocence is left open. Having bought peace the accused may not thereafter assert that the proceedings have terminated in his favor." *St. Paul*, 2006 WL 2773418, at *4 (quoting Restatement (Second), Torts § 660).

Second, Plaintiffs argue that the termination of the state case against Justin was not the entry of the *nolle*, but rather the Appellate Court dismissal of Justin's interlocutory appeal, and that as a result, the cases which hold that the entry of a bargained-for *nolle* bars a malicious prosecution claim are inapplicable. While Plaintiffs' argument is somewhat difficult to fathom, it nonetheless fails for several reasons. For one, it is clear that the criminal charges against Justin were abandoned when the prosecutor entered the *nolle*, not when the Appellate Court denied Mr. Frey's interlocutory appeal. For another, while Plaintiffs claim that Justin never gave up his right to an unqualified dismissal, it is undisputed that they did agree to the *nolle* after appealing the state court's denial of the motion to dismiss. Finally, Plaintiffs nowhere allege or demonstrate that the Appellate Court even had jurisdiction over the interlocutory appeal. Indeed, it appears that Plaintiffs' appeal became moot after entry of the *nolle* and dismissal of the charges against Justin.

Plaintiffs finally argue that the Court should not require a favorable termination in this case because Justin is a juvenile and that the requirement of a favorable termination as a condition precedent to a false arrest or malicious prosecution claim should apply only to adults. According

to Plaintiffs, there is too much pressure on juveniles to enter a plea to resolve charges against them, and therefore as a matter of policy, a favorable termination should not be required of juveniles. Plaintiffs offer no decisions in support of their novel argument, and the Court finds no basis in the case law to differentiate juvenile from adult charges. While the decision to accept the prosecutor's terms was surely a difficult (and unpleasant) one for Plaintiffs, Justin's age alone does not provide a reason to depart from the sound policy that requires an accused to insist on his innocence in order later to bring claims of false arrest or malicious prosecution.

Because Plaintiffs have not demonstrated that the charges against Justin were "discharged without a trial under circumstances amounting to the abandonment of the prosecution without request from or by arrangement with him,'" *Gosselin*, 133 Conn. at 160, they have failed to carry their burden on their § 1983 false arrest and malicious prosecution claims. As a result, Sgt. Maloney is entitled to summary judgment on those claims.

### B.    Probable Cause

Even if favorable termination were not required of Plaintiffs, or if they had demonstrated favorable termination of the charges against Justin, the false arrest and malicious prosecution claims would still fail because the undisputed facts show that there was probable cause to arrest and prosecute Justin for attempted sexual assault of a minor. "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Jenkins v. City of N.Y.*, No. 06-0182-CV, 2007 WL 415171, at *4 (2d Cir. Feb. 6, 2007) (internal quotation marks omitted); *see Russo*, 2007 WL 603066, at *5 ("[I]n Connecticut, a false arrest claim cannot lie when the challenged arrest was supported by probable cause."). Similarly, and as noted above, lack of probable cause is a required

element of a malicious prosecution suit under Connecticut law. *See Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn, LP*, 281 Conn. 84, 94 (2007).

"'[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Jenkins*, 2007 WL 415171, at *4 (quoting *Weyant*, 101 F.3d at 852) (alteration in original). Federal courts evaluate probable cause in light of the totality of the circumstances. *Id.* at *8. Likewise, under Connecticut law, probable cause "comprises such facts 'as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe' that criminal activity has occurred." *State v. Barton*, 219 Conn. 529, 548 (1991) (quoting *Stone v. Stevens*, 12 Conn. 218, 230 (1837)); *see also State v. Heinz*, 193 Conn. 612, 617 (1984) (defining probable cause as a standard "less demanding than that which attends an inquiry into whether there has been a prima facie showing of criminal activity. Instead, all that is required is that the affidavit, read in a common-sense manner, give objective evidence of a fair probability that proscribed activity has occurred."(citations omitted)).

In this case, Sgt. Maloney's application for an arrest warrant was reviewed by the State's Attorney's Office and approved by a Superior Court Judge. "An arrest pursuant to a warrant signed by a neutral judge or magistrate normally carries a presumption that it was made with probable cause." *Garcia v. Gasparri*, 193 F. Supp. 2d 445, 450 (D. Conn. 2002). Here, Mr. Frey conceded at oral argument that, if the statements in Sgt. Maloney's warrant application were true, there would have been probable cause to arrest Justin on the charges of sexual assault. Therefore, Plaintiffs

admit that the arrest warrant was valid on its face.[5]  Nonetheless, they insist that Sgt. Maloney

included material misstatements and omissions in his affidavit in support of the arrest warrant.

While "a plaintiff who argues that a warrant was issued on less than probable cause faces a *heavy*

*burden*," *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (emphasis added), Plaintiffs

may carry their burden if they can demonstrate that Sgt. Maloney "knowingly and intentionally, or

with reckless disregard for the truth, made a false statement in his affidavit or omitted material

information, . . . [where] such false or omitted information was necessary to the finding of probable

cause." *Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993) (citations and internal quotation marks

omitted).  This determination is a mixed question of law and fact, and "implicates what, in [the

Second Circuit], has come to be known as the 'corrected affidavits doctrine.'" *Escalera*, 361 F.3d at

743.

Under the corrected affidavits doctrine, the Court must construct what a hypothetical,

"corrected" warrant application would contain, based on the facts as they were known to the

_____

[5] There appears to be some uncertainty regarding whether a plaintiff may even assert a false arrest claim in Connecticut if he has been arrested pursuant to a legally authorized and facially valid warrant.  *See Russo*, 2007 WL 603066, at *6 n.8 (deciding the issue of false arrest on the basis of probable cause, but noting that "the applicable law for false arrest and false imprisonment 'is identical,' and therefore 'there is no cause of action for false imprisonment [because] the plaintiff was arrested pursuant to a facially valid warrant.'" (quoting *Outlaw v. City of Meriden*, 43 Conn. App. 387, 392-93 (App. Ct. 1996)).  *Outlaw* indicates that if "the arrest of the plaintiff is legally authorized, . . . . [a defendant] is liable, if at all, only for a misuse of the legal process to effect a valid arrest for an improper purpose.  The action must be for malicious prosecution . . . ." *Outlaw*, 43 Conn. App. at 392 (internal quotation marks omitted); *see Clewley v. Thomson*, 120 Conn. 440, 444 (1935) ("An action for false imprisonment does not lie where the plaintiff has been detained under regular process duly issued by a court having jurisdiction."); *cf. Singer*, 63 F.3d 110, 115 ("The essence of malicious prosecution is the perversion of proper legal procedures.  Ordinarily, this legal process will be either in the form of a warrant . . . or a subsequent arraignment . . . ." (internal quotation marks and citations omitted) (deciding New York law)).  The Court need not resolve this uncertainty in this case.

applicant, and must decide whether this corrected affidavit would support probable cause to arrest. *See Smith v. Edwards*, 175 F.3d 99, 105 (2d Cir. 1999). In so doing, the Court also must "put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause." *Martinez v. City of Schenectady*, 115 F.3d 111, 115 (2d Cir. 1997) (quoting *Soares*, 8 F.3d at 920). If the corrected warrant application also objectively supported probable cause, "no constitutional violation of the plaintiff's Fourth Amendment rights has occurred." *Soares*, 8 F.3d at 920; *see also Singer*, 63 F.3d at 118 ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.").

In his July 3, 2003 affidavit in support of the warrant application, Sgt. Maloney relied on and made reference to the following facts and allegations: (1) the initial phone call to police from K's mother and K's initial statement to Officer Kakalow that Justin had "touched her in a sexual way" and attempted to unhook her bra; (2) O's initial statement to Officer Kakalow that Justin exposed himself and told O to engage in a sexual act; (3) N's initial statement to Officer Kakalow that Justin beat him up and left bruises on his back; (4) Stephen Stefan's statement that the children had made substantially similar allegations to him; (5) a later statement from K's mother that K had told her that Justin told K he wanted to rape a five-year-old girl K watched; (6) O's mother's statement that she was aware of the incident between Justin and her son; (7) Mr. Frey's position that he was not sure Justin had done anything wrong; (8) N's later statement to Detective Ricci that Justin had covered N with pillows on the relevant day and that on the following day, Justin "used the bathroom in a soda bottle," and that he did not know anything else; (9) O's later statement to Detective Riordan that a week before the police arrived, Justin had exposed himself to O and directed him to engage in a

sexual act; (10) K's later, more detailed statement about the children's visit to Justin's house a few days before, including the allegations of attempted sexual assault; (11) K's confirmation of O's story, although saying it occurred around Halloween of the prior year rather than right before the police arrived; (12) K's confirmation of N's story about Justin going to the bathroom in a soda bottle, although dating it to February 2003, rather than May 2003, and adding details about Justin engaging in sexual acts with action figures; (13) K's confirmation that Justin had mentioned raping the child she watched (although stating that the girl was seven, not five); (14) K's mother's request that Justin be arrested; (15) S's statement that K had told her that Justin tried to make K "touch his privates" on the previous Halloween, and that K then told her in approximately May 2003 that Justin had raped her; and (16) Sgt. Maloney's conversation with O's father, during which O's father denied that any incident occurred between Justin and his son and further said that O had been forced by one of the officers to say that something had happened.

Plaintiffs contest the truth of virtually all of the foregoing statements and also allege that Sgt. Maloney omitted certain favorable information about Justin. For convenience, the Court groups its discussion of Plaintiffs' claims relating to Sgt. Maloney's affidavit into four categories. As that discussion demonstrates, Plaintiffs have not offered any evidence that Sgt. Maloney knew that the objectionable statements were false at the time he sought the arrest warrant, or acted in reckless disregard of the truth of the statements. In fact, for many of the statements included in his affidavit, Sgt. Maloney simply relied on the reports of other investigating officers (such as Officer Kakalow, Det. Riordan or Det. Ricci) or on signed statements provided by the minors or others. Moreover, utilizing the corrected affidavits doctrine, the Court is convinced that, even putting aside any allegedly false information or adding any alleged exculpatory information, there was sufficient

truthful information in the affidavit to support a finding of probable cause.[6]

    **1.**    Plaintiffs first argue that all of K's statements about Justin were false. Plaintiffs do not contest that K made the statements that the officers attributed to her. Indeed, Mr. Frey concedes that neither he nor Justin were present at any of the witness interviews conducted by Officer Kakalow, Det. Riordan, Det. Ricci, or Sgt. Maloney. Instead, Plaintiffs claim Sgt. Maloney knew (or perhaps should have known) that K's allegations were false because there were numerous inconsistencies in her various stories and her allegations were inherently incredible.

"An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer*, 63 F.3d at 119; *see Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness."); *State v. Amarillo*, 198 Conn. 285, 310 (1986) ("The victim's allegations [of sexual assault] did not require corroboration in order to establish probable cause."). Here, all of the witnesses, including K, gave signed statements on a form that contained the following language:

> I have read (or had read to me) the above statement, and it is true to the best of my knowledge. I fully understand that if I make a statement that is untrue and which is intended to mislead a law enforcement officer in the performance of his official

---

[6] Justin's later entry into the agreement to undergo evaluations in exchange for the entry of the *nolle* also bolsters Sgt. Maloney's showing of probable cause under Connecticut law. *See DeLaurentis*, 220 Conn. at 251 ("[W]e have always viewed the issue of whether the prior outcome was 'favorable' to the plaintiff as relevant to the issue of probable cause."); *St. Paul*, 2006 WL 2773418, at *4 ("Given the underlying charges against him, stalking and harassment, the plaintiff's acceptance of the no-contact condition of his nolle also evidences that those criminal charges were not brought without probable cause.").

function, I will be in violation of Section 53a-157 of the Connecticut General Statutes. (A false statement is a Class-Misdemeanor).
I HAVE READ THE ABOVE STATEMENT AND IT HAS BEEN READ TO ME. IT IS THE TRUTH.

*See* Mem. in Supp. [doc. # 96] Exs. G-J.  Other than his own conjecture, Mr. Frey has offered no admissible evidence that Sgt. Maloney knew that K had fabricated her allegations against Justin, or even that Sgt. Maloney acted with reckless disregard for their truth.

It is true that some of the details of K's statements conflicted with the statements of the other children (for example, the timing of certain incidents).  But that fact alone need not mean that she lied about Justin's alleged conduct or that Sgt. Maloney should have assumed that K was lying.  *See Donovan v. Briggs*, 250 F. Supp. 2d 242, 252-53 (W.D.N.Y. 2003).  It is not unusual for witnesses to criminal conduct to  recall details differently or give differing versions of the events.  Importantly, rather than suppressing the differences, Sgt. Maloney, to his credit, included all of the different versions of K's story in his affidavit, including conflicting details.  Thus, he provided the prosecutor and the Superior Court Judge with all of the facts he had uncovered–even the conflicts in the stories of the witnesses–so that the prosecutor and the judge could evaluate the allegations and the veracity of the witnesses for themselves.  There is no evidence in the record that Sgt. Maloney misrepresented or omitted any inconsistency in K's story over time.  Nor does the Court believe that Sgt. Maloney should have disbelieved K based upon those inconsistencies.

Plaintiff next assert that Sgt. Maloney deliberately elicited false testimony from K in order to make good on his alleged threats to Mr. Frey.  Even though the Court assumes, as it must, that Sgt. Maloney made the alleged  threat to Mr. Frey, it need not accept Plaintiffs' bald accusation that Sgt. Maloney then purposely elicited a knowingly false statement from K.  *See* Pls.' Local Rule 56(a)

Statement [doc. # 109] Ex. 2 at 49-51.[7] There is simply no evidence in the record that would permit a reasonable jury to reach such a conclusion. While K was a minor, she was in the company of her mother during the interviews in question, *see id.* Ex. 2 at 49, and Mr. Frey nowhere alleges that Sgt. Maloney convinced K's mother to allow her daughter to give and sign her name to false accusations. To support their theory against Sgt. Maloney, Plaintiffs seize on K's mother's change of position with regard to Justin's arrest, but there is no evidence that Sgt. Maloney asked K's mother to change her position in order to "make things worse" for Justin, or that she did so as a result of prompting from Sgt. Maloney.

In a related vein, Plaintiffs contend that Sgt. Maloney had it in for Justin from the time that Mr. Frey refused to allow his son to speak to DCF in May 2003. Plaintiffs argue that Sgt. Maloney's animus somehow bears on the issue of probable cause or lack thereof. Plaintiffs are wrong. Sgt. Maloney's "motivation is not a consideration in assessing probable cause." *Singer*, 63 F.3d at 119.

Finally, Plaintiffs claim that Sgt. Maloney should have conducted a more thorough investigation of the claims against Justin, including interviewing other children in the neighborhood of similar age, and that, had he done so, he would have discovered that K was a liar. In fact, this appears to be Plaintiffs' chief complaint with Sgt. Maloney–that his investigation of Justin was not thorough enough and had it been more searching, Sgt. Maloney would have uncovered sufficient exculpatory information regarding Justin and therefore would never have sought an arrest warrant. In particular, Plaintiffs point to the affidavit of another minor in the neighborhood, who states that

---

[7]   Moreover, Plaintiffs themselves offer an August 2003 affidavit of D, a minor neighbor. In her affidavit, D states that K told her that Justin had tried to rape K on the day in question in this case. Pls.' Local Rule 56(a) Statement [doc. # 109] Ex. 4 para. 9. The affiant states that K told her this on the same day it allegedly occurred, which was before Sgt. Maloney even got involved in the investigation, much less made his alleged threats to Mr. Frey.

O told her that K had lied to the police. *See* Pls.' Local Rule 56(a) Statement [doc. # 109] Ex. 4 paras. 12-13.

There are several problems with Plaintiffs' argument as well as the affidavit on which it is based. For one, the affidavit itself is not admissible evidence because it consists of multiple layers of hearsay. It also never states what K lied to the police about. The affidavit was also obtained over a month after Sgt. Maloney applied for the arrest warrant, and there is no evidence that he interviewed this individual before applying for the warrant, or that he was even aware that this individual had relevant information regarding K or Justin.[8] More importantly, however, Sgt. Maloney was under no obligation to continue his investigation in order to gather additional evidence that "might have cast doubt upon the basis for the arrest." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001). The Second Circuit does not "impose a duty on the arresting officer to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest." *Jocks*, 316 F.3d at 135-36.[9] Therefore, the Court finds no basis to conclude that Sgt. Maloney made any material misrepresentations or omissions

---

[8] Plaintiffs also submit a type-written affidavit, dated July 26, 2006, from an individual claiming to have hosted K on a night she said she was raped by several boys on a beach in West Haven, after sneaking out of the affiant's house. *See* Pls.' Local Rule 56(a) Statement [doc. # 109] Ex. 11. Not only was this affidavit also obtained after the arrest warrant was issued, the body and attested portion of the affidavit indicate nothing more than that K alleged she had been raped in July 2005, long after the events in question. The page attached to this affidavit, which alleges that K never left the affiant's house that evening, is handwritten, unattested, and of unknown authorship. Finally, this affidavit is plainly irrelevant to whether K's allegations against Justin were false and if so, whether Sgt. Maloney knew or should have known that.

[9] This also dooms Plaintiffs' related argument that Sgt. Maloney omitted from his affidavit that N had voluntarily gone to play with Justin at Justin's house. Plaintiffs admit that they cannot say for a certainty that N told the police of this alleged fact. Instead, Plaintiffs merely allege that Sgt. Maloney should have uncovered this fact during the course of his investigation and should have included it in his affidavit.

regarding the statements of K contained in his warrant application, or that he knew or should have known that her allegations against Justin were false.

2.    Plaintiffs also contend that Sgt. Maloney included material misrepresentations when he recited the allegations of O and N.   The basis of this claim regarding O is that Sgt. Maloney omitted from his affidavit that O's father stated that O recanted his story on the very day the child first made allegations against Justin to Officer Kakalow.   In support of this claim, Mr. Frey cites his own affidavit, which states:

> In July 2003, [O's father] explained to me that when the police had first come to his house with O[], [O's father] had explained to the police that the entire story was made up at the request of K[] . . . .   During this same conversation, [O's father] explained that O[] recanted his accusation as soon as he was brought back [sic] K['s] house and after [his father] told O[] to tell the truth.

Pls.' Local Rule 56(a) Statement [doc. # 109] Ex. 1 paras. 3-4.   In addition, Mr. Frey points to a handwritten affidavit signed by O's father on July 7, 2003, stating that "[t]he story . . .that Mr. Justin hurt my son . . . is compleltly [sic] created by Somebody and it is not true. . . .   My son says that Mr. Justin never hurt him." *Id.* Ex. 16.

Beyond the multiple hearsay aspects of Mr. Frey's affidavit, there are several additional problems with the Plaintiffs' arguments.   First, O's father's affidavit and Mr. Frey's affidavit both post-date Sgt. Maloney's July 3, 2003 warrant application.   Moreover, O's father's letter does not say that O recanted on the same evening that the police first interviewed him, or even that he ever recanted to the police.   In fact, Det. Riordan's report on June 9, 2003, which is after O's supposed recantation, recited that O had reaffirmed that Justin had behaved in a sexual manner in O's presence in May 2003.   *See* Mem. in Supp. [doc. # 96] Ex. A paras. 17-18.   To the extent that O's father rejected the allegations made by his son, or that his son made any allegations, Sgt. Maloney included

that fact in his affidavit in support of the warrant. Therefore, the prosecutor and judge were aware of O's father's rejection of O's claims at the time they approved the arrest warrant. *See id.* In sum, the Court can find no evidence of any misstatement or omission, much less a material one, regarding O's allegations against Justin or O's father's position regarding O's allegations.[10]

Mr. Frey further argues that Sgt. Maloney included N's allegations that Justin "beats him up and leaves bruises on his back," Mem. in Supp. [doc. # 96] Ex. A para. 4, for the sole purpose of harming Justin. According to Plaintiffs, the inclusion of these facts painted Justin "as a bad person." Objection to Motion for Summary Judgment [doc. # 108] at 8. Mr. Frey goes on to argue that Sgt. Maloney's threat to harm Justin "is the only logical explanation as to why this irrelevant information would be included in Maloney's Affidavit." *Id.* at 9.

As indicated previously, Sgt. Maloney's motivations for including statements and facts in his affidavit is not a relevant issue in determining probable cause. Plaintiffs do not dispute that N made the statements that are attributed to him. While Plaintiffs believe that Sgt. Maloney should not have credited those statements or included them in the affidavit, there is nothing in the record that would have given Sgt. Maloney any basis for disbelieving N's allegations or omitting them from his affidavit. After all, N was supposed to have been a witness to allegations involving sexual and violent conduct by Justin. In that context, N's statement was hardly gratuitous or irrelevant. In any event, whatever the relevance of N's statement, Sgt. Maloney accurately provided it to the court,

---

[10] Mr. Frey also alleges that Sgt. Maloney materially misrepresented a statement by O's mother that she was aware of the incident between Justin and her son, *see* Mem. in Supp. [doc. # 96] Ex. A para. 11, and a statement that O's brother was angered when O told him what had occurred, *see id.* para. 17. Mr. Frey's basis for contesting these assertion is some hoped-for, but not yet obtained, testimony from O's mother and brother. It is undisputed that there is no such evidence in the record developed for summary judgment, however, and Mr. Frey's prediction of future favorable testimony is plainly insufficient at this stage. *See* Fed. R. Civ. P. 56(e).

which was responsible for making the probable cause determination.

**3.** Plaintiffs next claim that Sgt. Maloney misrepresented to the court that Mr. Frey was "uncooperative." According to Mr. Frey, he was always willing to have Justin undergo evaluation, provided that the results of the evaluation would be protected against use in any future criminal prosecution. Pls.' Local Rule 56(a) Statement [doc. # 109] Ex. 1 para. 17. However, all Sgt. Maloney did in his affidavit was relay that Ms. Read "advised that Mr. Frey was not cooperating with DCF to their satisfaction." *See* Mem. in Supp. [doc. # 96] Ex. A para. 14. It is undisputed that Ms. Read, the DCF case worker assigned to the investigation, informed Mr. Frey that she had "notified the Milford Police Department of [his] failure to cooperate . . . ." *Id.* Ex. E. Therefore, Sgt. Maloney did not misrepresent in his affidavit that DCF perceived Mr. Frey as being uncooperative.

**4.** Finally, Plaintiffs point to a number of misstatements or omissions in Sgt. Maloney's affidavit. For example, Sgt. Maloney stated that he had told Mr. Frey that if he cooperated, the charges against Justin would be dropped. But Mr. Frey says that Sgt. Maloney actually said he could not guarantee that there would never be an arrest; Mr. Frey took that statement as a threat to cooperate or Justin would be arrested. Plaintiffs also complain that Sgt. Maloney omitted the fact that he had threatened to "make things worse" for Justin if Mr. Frey did not cooperate with DCF. Mr. Frey claims that he alerted Sgt. Maloney to O's alleged recantation before the arrest warrant was issued, but that Sgt. Maloney omitted that fact from his affidavit, and also told Sgt. Maloney that K was a liar and that there was not a single bit of credible evidence that his son had done any of the acts of which he was accused.

For present purposes, the Court is willing to assume the truth of Mr. Frey's claims and that Sgt. Maloney omitted the alleged information from his affidavit. Yet, correcting Sgt. Maloney's

affidavit to reflect the foregoing facts, as Plaintiffs allege them, does not alter the result.  For the corrected affidavit, no less than the original one, provides more than sufficient information to support a finding of probable cause as a matter of law.  For the most part, the information Plaintiffs wish to add is either not relevant to the determination of probable cause or does not contradict the truthful information contained in Sgt. Maloney's affidavit.  *See, e.g.*, *Smith*, 175 F.3d at 106 ("[H]ad Edwards' affidavit been 'corrected' in the manner plaintiff now proposes, we see nothing in the outcome of the Superior Court proceedings that would have negated probable cause."); *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994) ("There can be no genuine dispute that the magistrates would have found probable cause sufficient for both warrants even after correction for whatever factual errors were reported.").

In sum, the Court finds that there was ample evidentiary basis to believe "that the person to be arrested has committed or is committing a crime." *Jenkins*, 2007 WL 415171, at *4.  The charges levied against Justin by the minors were serious, and while it might later have developed that their stories were exaggerated or even imagined, Sgt. Maloney had no basis for concluding that at the time he sought the arrest warrant (indeed, to this day, their stories have not been *proven* false).  Mr. Frey's strongly-held and genuine conviction that the charges against his son were false does not mean that at the time Sgt. Maloney sought the arrest warrant from the court, he lacked probable cause to do so.  In that regard, the Court notes that the Connecticut Superior Court twice refused to lift the electronic monitoring and curfew conditions it placed on Justin and rejected Justin's claim that the charges against him should be dismissed on the ground that there was insufficient evidence that he had committed the crime alleged.  *See* Mem. in Supp. [doc. # 96] Ex. M.  Because Sgt. Maloney had probable cause to arrest Justin,  Sgt. Maloney is entitled to summary judgment on Plaintiffs' § 1983

false arrest and malicious prosecution claims. *See Panetta v. Crowley*, 460 F.3d 388, 399 (2d Cir. 2006).[11]

## IV.

Plaintiffs also sue Sgt. Maloney under § 1983 on the basis of his alleged threat to Mr. Frey to "make things worse" for Justin if Mr. Frey did not accede to an evaluation of Justin by DCF. Plaintiffs' theory of recovery for this threat is that it violated Justin's right to remain silent and his privilege against self-incrimination, in contravention of the Fifth Amendment. In particular, Plaintiffs argue that Sgt. Maloney made good on the threat in two ways that violated Justin's Fifth Amendment rights: (1) Justin was forced into the *nolle* deal with the state prosecutor; and (2) he was punished for relying on his Fifth Amendment rights by being arrested.

As to the first claim, Mr. Frey admitted at oral argument that he had no reason to suspect that Sgt. Maloney was involved in any way with the negotiation of the *nolle* arrangement with the prosecutor or that Sgt. Maloney somehow influenced the prosecutor and the court in connection with the juvenile court proceedings. Therefore, putting aside for the moment the legal viability of Plaintiffs' first theory, it fails for want of any facts to support it.

As to Plaintiffs' second theory, the Supreme Court has made clear what a plaintiff must demonstrate in order to recover on a Fifth Amendment violation under § 1983. In *Chavez v.*

_____

[11] Even if the Court were wrong on the issue of probable cause, the Court would conclude that on the basis of the undisputed facts in the record, Sgt. Maloney had "arguable probable cause" and that therefore, he would be entitled to qualified immunity on Plaintiffs' false arrest claim. Arguable probable cause exists "if officers of reasonable competence could disagree on whether the probable cause test was met." *Jenkins*, 2007 WL 415171, at *5 (internal quotation marks omitted); *see Simpson v. Denardo*, No. 3:02CV1471(MRK), 2004 WL 1737444, at *8 (D. Conn. July 29, 2004); *Szekeres v. Schaeffer*, No. Civ. 301CV2099(MRK), Civ. 301CV2108(MRK), 2004 WL 722240, at *5, *8 (D. Conn. Mar 26, 2004). The Court finds that this test is more than satisfied in this case.

*Martinez*, 538 U.S. 760 (2003), the Supreme Court concluded that "a violation of the constitutional *right* against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case." *Id.* at 770. It is undisputed in this case that Justin never made any statement that was subsequently used against him in a criminal case. In fact, Mr. Frey's affidavit confirms that "[o]n the same day that the State agreed not to used [sic] the evaluation against Justin F., I consented to having Justin evaluated." Pls.' Local Rule 56(a) Statement [doc. # 109] Ex. 1 para. 18. Therefore, Plaintiffs' Fifth Amendment claim fails under the plain teachings of *Chavez*.[12]

Despite his failure to satisfy *Chavez*'s requirements for pursuing a self-incrimination claim, the Court recognizes that, in some instances, an individual can make out a substantive due process claim where he has suffered "deprivations of liberty caused by 'the most egregious official conduct,'" *Chavez*, 538 U.S. at 774 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846-48, n.8 (1998)). However, Plaintiffs never made such an argument in either their summary judgment papers or at oral argument. Nor does the Court believe that Sgt. Maloney's conduct "shock[s] the conscience," as it must in order for the Plaintiffs to prevail on a substantive due process claim. *See id.*

In their complaint, Plaintiffs allege that Sgt. Maloney violated Justin's constitutional rights "to equal protection, to be secure in his person, to travel, to due process and to association." Complaint [doc. # 1] para. 58. However, Plaintiffs did not pursue their arguments regarding equal protection, due process, or security in the person in their briefing or at oral argument, and accordingly, the Court deems them to have been abandoned. As to Plaintiffs' claims that Sgt.

---

[12] Undeterred, Plaintiffs argue that *Chavez* is distinguishable from this case because *Chavez* involved an adult while Justin is a juvenile. Once again, Plaintiffs cite no cases in in support of their assertion that there should be a juvenile exception to the Supreme Court's holding in *Chavez*. Nor does the Court believe that Plaintiffs' proposed exception is a sensible or correct interpretation of *Chavez*.

Maloney violated Justin's rights to travel and to association, Mr. Frey admitted at oral argument that the predicate for these claims was the unlawful arrest of Justin. Indeed, the right to travel claim is nothing more than the consequence of Justin's arrest and prosecution and the restrictions that the juvenile court placed on his travel as a result of his arrest. The Court has already determined that Justin's arrest and prosecution were lawful and supported by probable cause. Plaintiffs' right to travel claim fails for similar reasons. Accordingly, Sgt. Maloney is entitled to summary judgment on Plaintiffs' § 1983 claims of various constitutional violations.

Plaintiffs have also sought to hold the Town of Milford liable for the allegedly illegal actions of Sgt. Maloney. "Under 42 U.S.C. § 1983, a municipality may be held liable for a constitutional violation if the plaintiff can prove that the violations resulted from a municipality's customs or policies." *Smith*, 175 F.3d at 107 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). Because the Plaintiffs have failed to prove that Justin suffered a constitutional violation, the Town of Milford is also entitled to summary judgment.[13] *See Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123, 132 (2d Cir. 1997) (citing *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)).

## V.

Plaintiffs also seek to hold Sgt. Maloney liable under RICO. In their Complaint [doc. # 1] and U.S.C. §§ 1961-1968 RICO Statement [doc. # 34] ("RICO Statement"), Plaintiffs claim that Sgt. Maloney influenced the testimony of K and K's mother, misrepresented the testimony of Mr. Frey,

---

[13] In their Complaint, Plaintiffs allege that the Town of Milford is liable to them for an alleged assault on Justin and vandalism at Mr. Frey's residence following Sgt. Maloney's investigation. However, Plaintiffs failed to raise this claim in either their briefs or at oral argument, and they have provided no evidence that these alleged events ever occurred or were attributable to some policy or custom of the Milford Police Department. *See* Complaint [doc. # 1] paras. 121-24. Accordingly, the Court considers these claims to have been abandoned.

and conspired with Det. Ricci and Det. Riordan to influence the testimony of the other minor witnesses.

RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). *See Allstate Ins. Co. v. Seigel*, 312 F. Supp. 2d 260, 264 (D. Conn. 2004) (discussing the elements required to state a claim under RICO). "'In order to bring suit under § 1964(c), a plaintiff must plead (1) the defendant's violation of [18 U.S.C] § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 283 (2d Cir. 2006) (quoting *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001)). "RICO's use of the clause 'by reason of' has been held to limit standing to those plaintiffs who allege that the asserted RICO violation was the legal, or proximate, cause of their *injury*, as well as a logical, or but for, cause." *Id.* at 283-84 (internal quotation marks omitted).

Plaintiffs bring their RICO claim under § 1962(c), which prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," and § 1962(d), which makes it unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [§ 1962]." "To establish the existence of a RICO conspiracy, a plaintiff must prove the existence of an agreement to violate RICO's substantive provisions." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999). Plaintiffs contend that at the time Sgt. Maloney was employed by the Milford

31

Police Department, which they allege to be the RICO enterprise,[14] he, Det. Riordan, and Det. Ricci participated in the Police Department's affairs "through a pattern of racketeering activity" by "corruptly persuad[ing] another person, attempt[ing] to do so, and engag[ing] in misleading conduct toward another person," *see* 18 U.S.C. § 1512(b), with the intent to: (1) influence the testimony of these individuals in an official proceeding against Justin; (2) cause or induce these individuals to withhold testimony favorable to Justin; and (3) cause or induce some person to evade to produce a record or document, all of which would violate 18 U.S.C. § 1961(1). *See* RICO Statement [doc. # 34] at 2-3.[15]

There are numerous problems with Plaintiffs' RICO claim, and the Court will not address all of them. First, as the Court earlier indicated, there is no admissible evidence in the record that would permit a reasonable jury to conclude that Sgt. Maloney or the other detectives improperly influenced or attempted improperly to influence the complaining individuals in this case. That is, the record is devoid of evidence that Sgt. Maloney engaged in the predicate acts of "corruptly persuad[ing] another person, attempt[ing] to do so, [or] engag[ing] in misleading conduct" within the meaning of § 1512. Accordingly, there is no evidence in the record that Sgt. Maloney violated §1962(c). *See*

––––––––––––––––––––––

[14] A governmental unit can be an enterprise for the purposes of a RICO claim. *See De Falco v. Bernas*, 244 F.3d 286, 308-09 (2d Cir. 2001) ("[T]he Town of Delaware was a passive instrument through which the defendants wielded power for their personal benefit and, accordingly, was a RICO enterprise." (internal quotation marks omitted)); *see also United States v. Angelilli*, 660 F.2d 23, 33 (2d Cir. 1981) ("[T]he language of section 1961(4), defining enterprise, . . . unambiguously encompasses governmental units, and . . . the purpose and history of the Act and the substance of RICO's provisions demonstrate a clear congressional intent that RICO be interpreted to apply to activities that corrupt public or governmental entities.").

[15] Plaintiffs also included an allegation of extortion, but neither argued this ground in their briefing or at oral argument, nor provided any proof to support such an allegation. The Court therefore treats this claim as abandoned.

*Cofacredit, S.A.*, 187 F.3d at 243-44 (reversing district court's finding of predicate acts on the basis of lack of evidence).

There is also no evidence in the record to support Plaintiffs' claim that Sgt. Maloney, Det. Riordan, and Det. Ricci entered into an agreement to "violate RICO's substantive provisions." *See Cofacredit, S.A.*, 187 F.3d at 244-45 (finding insufficient evidence of a conspiracy to commit a pattern of racketeering activity) (internal quotation marks omitted).  In fact, there is no evidence whatsoever that Sgt. Maloney had any discussion about Justin with either Det. Ricci or Det. Riordan at any point in the time period between May 8, 2003 (when he first became involved in this matter) and July 3, 2003 (when he applied for the arrest warrant), much less had an agreement with either of them to violate RICO.

Second, the Court is not convinced that Plaintiffs have adequately demonstrated "a pattern of racketeering," which the statute defines as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1651(a).   The Second Circuit has characterized the pattern requirement as a showing of "'multiple racketeering predicates–which can be part of a single 'scheme'–that are related and that amount to, or threaten the likelihood of, continued criminal activity.'"  *United States v. Reifler*, 446 F.3d 65, 91 (2d Cir. 2006) (quoting *United States v. Coiro*, 922 F.2d 1008, 1016 (2d Cir. 1991)).  The Supreme Court teaches that the continuity requirement can be satisfied in two ways:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. . . . A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. . . . Congress was concerned in RICO

with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated.

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241-42 (1989); *see First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004) ("Notably, this Court has never found a closed-ended pattern where the predicate acts spanned fewer than two years."); *De Falco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001) (same); *GICC Capital Corp. v. Tech. Fin. Group*, 67 F.3d 463, 465-66 (2d Cir. 1993) (finding predicate acts occurring over eleven-month period insufficient). Notably, the Supreme Court has explained that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy th[e continuity] requirement . . . ." *Northwestern Bell Tel. Co.*, 492 U.S. at 242.

Here, the racketeering predicates to which the Plaintiffs point all occurred over the course of at most two months–between May 8, 2003 and July 8, 2003–from Sgt. Maloney's assumption of the investigation until Justin's appearance in juvenile court. Plaintiffs have offered no admissible evidence of other victims of the alleged racketeering activity beside Justin. Moreover, Sgt. Maloney has retired from the Milford Police Department, and Plaintiffs have not alleged that Det. Ricci or Det. Riordan continue to threaten the constitutional rights of others. *See* Pls.' Local Rule 56(a) Statement [doc. # 109] Ex. 2 at 68. Therefore, Plaintiffs have failed to establish a pattern of racketeering activity as required by RICO. *See, e.g.*, *Cofacredit, S.A.*, 187 F.3d at 242.

Third, under RICO, "the plaintiff only has standing [under § 1964(c)] if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Burdick v. Am. Express Co.*, 865 F.2d 527, 529 (2d Cir. 1989) (quoting *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985)); *Evans v. City of Chi.*, 434 F.3d 916, 925 (7th Cir. 2006) (confirming

34

that the injury requirement and the causation requirement must both be met to confer standing). Assuming Plaintiffs could prove that the alleged predicate acts occurred, Plaintiffs have not demonstrated any injury to business or property caused by Sgt. Maloney's alleged violations of § 1962. In fact, Plaintiffs allege *no injury to business or property whatsoever* in their RICO Statement. *See* RICO Statement [doc. # 34] para. 15.

At oral argument, the Court asked Mr. Frey what damages to business or property he and his son had sustained. Understandably, Plaintiffs' primary claim of injury is the alleged damage to their reputations and their emotional well-being as a result of the arrest. However, to state a claim under RICO, a plaintiff "must allege facts demonstrating both that plaintiff's injury is to his business or property–and not physical, emotional or reputational harm or any economic aspect of such harm," and damages arising from such personal injuries are not recoverable under RICO. *Hollander v. Flash Dancers Topless Club*, 340 F. Supp. 2d 453, 458-59 (S.D.N.Y. 2004), *aff'd*, No. 04-6700, 2006 WL 267148 (2nd Cir. Feb 3, 2006) (unpublished opinion); *see Bankers Trust Co. v. Rhoades*, 741 F.2d 511, 515 (2d Cir. 1984), *vacated on other grounds*, 473 U.S. 922 (1985).

The closest cognizable injury to business or property that Plaintiffs offered were Mr. Frey's out-of-pocket costs in representing Justin in the juvenile court proceedings and Justin's inability to do yard work outside his grandparents' house during the summer due to the juvenile court's order of home confinement, which limited him to the interior of his grandparents' house. Mr. Frey informed the Court at oral argument that Justin would on occasion help his grandparents outside, but he provided no further specifics to this claim nor did he accept the Court's invitation to brief his RICO claim further.

There is a substantial question whether such alleged injuries fall within the type of injuries

that RICO was intended to remedy, since they appear to be entirely incident to the personal injury that Plaintiffs allege Justin sustained. *See Evans*, 434 F.3d at 926-31 ("[F]oregone earnings stemming from the lost opportunity to seek or gain employment are . . . insufficient to satisfy § 1964(a)'s injury to 'business or property' requirement where they constitute nothing more than pecuniary losses flowing from what is, at base, a personal injury."). *But see Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) (holding that plaintiff stated sufficient injury to business or property when he was unable to seek gainful employment while unjustly incarcerated); *Stochastic Decisions, Inc. v DiDomenico,* 995 F.2d 1158, 1166-67 (2d Cir. 1993) (recognizing legal fees as RICO injury where defendants' predicate acts included preventing collection efforts on outstanding judgment).

The Court need not resolve that question, however. For Plaintiffs have produced no affidavit from Justin or Justin's grandparents that Justin had any claim to wages arising from the occasional yard work he had done in the past. In fact, in Justin's affidavit, he attests to his emotional trauma arising from the prosecution, but mentions nothing about being unable to work in his grandparents' yard. *See* Pls.' Local Rule 56(a) Statement [doc. # 109] Ex. 20.[16] Likewise, Mr. Frey has produced no documentary evidence of what his alleged out-of-pocket costs and expenses were.[17] At oral

---

[16] Moreover, there is evidence in the record that Justin did help his grandparents during the summer by painting the inside of their home and that his grandparents remunerated him through video games, instead of cash. *See* Mem. in Supp. [doc. # 96] Ex. D at 66-67. Plaintiffs have not demonstrated or argued that Justin would have done yard work in addition to painting but for his home confinement, or how his remuneration for painting compared to what he legitimately could have expected to receive for working in the yard.

[17] The Court notes that the Complaint does not contain any particular claim of damage by Mr. Frey against Sgt. Maloney. While the Plaintiffs' RICO Statement lists injury to Douglas Frey as "the time and costs to defend Justin F. in the" juvenile proceedings, RICO Statement [doc. # 34] para. 17, and the Complaint states that "[t]he conduct described in this count was part of a larger scheme to injure Plaintiffs in violation of [RICO]", *id.* para. 100, the RICO count itself does not allege any way in which Mr. Frey was injured in his individual capacity. Therefore, the Court has

36

argument, he claimed that he paid copying and mailing charges, as well as the filing fee for his appeal to the Connecticut Appellate Court. However, there is no evidence of any such damages in the record developed for summary judgment.

Finally, though the Court need not (and does not) decide the issue of causation, the Court is skeptical that Plaintiffs have adequately demonstrated that Justin's hoped-for wages from his grandparents or Mr. Frey's alleged out-of-pocket expenses in defending his son were causally connected to the alleged RICO violation. *See* RICO Statement [doc. # 34] para. 16. Justin's inability to go outside his grandparents' house and work in their yard was the result of the juvenile court's order and the court's refusal to modify the conditions. Similarly, the mailing and copying costs and filing fee Mr. Frey incurred in defending his son were caused, not by the alleged racketeering activity, but by the prosecutor's decision to carry on with the case and the juvenile court's decisions to impose certain conditions and to deny Plaintiffs' motion to dismiss the case. *See* Mem. in Supp. [doc. # 96] Exs. L, M; *see also Hollander*, 340 F. Supp. 2d at 462 (discussing proximate causation).

Plaintiffs have provided no evidence that would permit a reasonable jury to conclude that Sgt. Maloney's arrest warrant affidavit played any role in any of those decisions. In fact, Justin's prosecution continued over a period of ten months, and Mr. Frey admitted at oral argument that Sgt. Maloney had no involvement at all in those proceedings. As the Supreme Court has pointed out, "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 269 (1992) (quoted in *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991,

---

significant doubts whether Mr. Frey has even asserted an individual RICO claim against Sgt. Maloney or that he would even have standing to do so.

1997 (2006)).

As should be apparent from the foregoing discussion, Plaintiffs' RICO claim suffers from a number of fatal flaws. Accordingly, Sgt. Maloney is entitled to summary judgment on Plaintiffs' RICO claim.

## VI.

In light of the Court's dismissal of the only federal causes of action pleaded in the complaint, the Court, exercising its discretion under 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over the remaining state causes of action. The Second Circuit has advised district courts that "'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine–judicial economy, convenience, fairness, and comity–will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). This is the "usual case" envisioned in *Valencia*. All that remains in this case are claims that involve complex issues of state law. Therefore, in the interests of judicial economy, convenience, fairness, and comity, the Court declines to exercise supplemental jurisdiction over the Plaintiffs' claims for violation of Justin's rights under the Connecticut Constitution, negligence, and intentional infliction of emotional distress.

## VII.

The Court GRANTS IN PART Defendant's Motion for Summary Judgment [doc. # 95]. Judgment should enter for Defendants and against Plaintiffs on Counts One, Four, and Five of the Complaint, which allege that Sgt. Maloney violated 18 U.S.C. § 1983, Counts Eight and Nine, which

allege that the Town of Milford violated 18 U.S.C. § 1983, and Count Two, which alleges that Sgt. Maloney violated RICO. The Court DISMISSES without prejudice for lack of jurisdiction Counts Three, Six, and Seven of the Complaint, which allege violations of the Connecticut Constitution, as well as negligence, and intentional infliction of emotional distress. To the extent that Counts Four, Five, and Eight allege state law claims, those too are DISMISSED without prejudice. Plaintiff may re-file his state law claims in state court. Each side shall bear its own costs and attorneys' fees. **The Clerk is directed to close this file.**

IT IS SO ORDERED.

/s/ _____Mark R. Kravitz_____
United States District Judge

Dated at New Haven, Connecticut: **March 7, 2007**.